# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
### No. 19-1061V

| | |
|---|---|
| MARILYN HENDRICKS,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: August 6, 2025 |

*Douglas Alan Pettit*, Pettit Kohn Ingrassia Lutz, & Dolin, San Diego, CA, for Petitioner.

*Jennifer Leigh Reynaud*, U.S. Department of Justice, Washington, DC, for Respondent.

### **DECISION AWARDING DAMAGES**[1]

On July 23, 2019, Marilyn Hendricks filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a syncopal episode after receiving an influenza ("flu") vaccine on October 11, 2017. Petition at 1. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters. Although entitlement was conceded, the parties could not agree on all the damages components, so a hearing was set, and argument was heard on June 10, 2025.

---

[1] Because this unpublished Decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons set forth below, and as stated during the hearing,[3] I find that Petitioner is entitled to an award of damages in the total amount of **$335,661.74, consisting of $78,661.74, for past unreimbursable expenses, $7,000.00 for future medical expenses, and $250,000.00 for actual pain and suffering.**

I. **Relevant Procedural History**

On September 11, 2020, Respondent filed his Rule 4(c) Report recommending compensation under the Vaccine Act. ECF No. 17. On September 15, 2020, I issued a Ruling on Entitlement in Petitioner's favor. ECF No. 18. On February 4, 2022, after initial attempts to resolve the damages in this case were unsuccessful, I referred this case for alternative dispute resolution ("ADR") at the request of the parties. ECF No. 34. ADR proceedings were unsuccessful and concluded on June 23, 2023. ECF No. 41. Thereafter, I ordered the parties to brief damages. On November 6, 2023, Petitioner filed her brief in support of damages. ECF No. 44 ("Mot.") Respondent filed his response on February 23, 2024. ECF No. 46 ("Opp."). Petitioner filed a Reply on April 23, 2024. ECF No. 48 ("Reply").

A damages hearing was held on June 10, 2025, and Petitioner was the sole witness. This case is now ripe for adjudication.

II. **Relevant Factual History**

Ms. Hendricks was a healthy 23-year-old recruiter when she received a flu vaccine at a CVS pharmacy located in San Francisco, California, at approximately 9:00am, on October 11, 2017. Petitioner's Exhibit ("Ex.") 3 at 3. She exited the CVS, crossed the street, and fainted, striking her face on the sidewalk. Ex. 2 at 16, 23. According to witnesses, Ms. Hendricks lost consciousness for about five to ten seconds before being transported to the emergency department ("ED") at Zuckerberg San Francisco General Hospital by ambulance. *Id.* at 16. During her testimony, Ms. Hendricks recalled waking up in the ambulance, feeling confused, and seeing blood on her hands and down her neck along with experiencing severe pain in her lip and nose. Tr. at 8.

Upon arrival at the hospital, Ms. Hendricks recalled having to wait several hours to be seen. Tr. at 9. She testified that it took a long time just to "put me in the queue to get analyzed." *Id*. Ms. Hendricks stated that during that long wait, she was in excruciating pain "for quite a long time." *Id*. She eventually underwent a CT scan of her head, face, and spine which demonstrated a mildly displaced fracture of the anterior nasal spine and multiple mandibular fractures, and mandible soft tissue swelling with scattered bone

---
[3] *See* Minute Entry dated June 10, 2025.

fragments. *Id*. at 6. On physical exam, Petitioner had an abrasion above her right eyebrow, a mandible fracture, multiple fractured teeth, and three lacerations on her lip and chin that required sutures. *Id*. at 23-24. Ms. Hendricks described having to wait for nearly 12 hours before her wounds were sutured, "which means they were open for, like, over 12 hours, which I thought was insane, the most excruciating experience as well, like one of the worst parts of it all." Tr. at 11-12. She was discharged from the ED to her home shortly after midnight, with instructions to follow up with an oral surgeon as her injuries required surgery. Ex. 2 at 10; Ex. 12 at 62. Ms. Hendricks stated that her mother had flown to San Francisco from San Diego and arrived at the hospital around 9pm to take her home. Tr. at 12. Petitioner explained that she was unable to talk and relied on her mother to make phone calls to find an oral surgeon who was able to perform urgent surgery to repair her fractures and wounds. *Id*.

The next day (October 12, 2017), Ms. Hendricks and her mother drove to San Jose so that Petitioner could be evaluated by oral surgeon John Wesley Emison, M.D., D.D.S. Tr. at 13; Ex. 5 at 19-21. Upon physical exam, Dr. Emison noted that Ms. Hendricks had a Band-aid above her right temple area, and at least two lacerations of her chin and lower lip area, which had been sutured. Ex. 5 at 19. He noted "multiple fractured teeth, facial swelling and some mild ecchymosis of the face." *Id*. Dr. Emison also noted, "[t]he patient's mouth is hanging open. The patient is noted to be in moderate distress due to the injury. The patient has trismus, cannot open her mouth very widely and she was very difficult to examine, said it hurt to tilt her chair back…" *Id*. His impressions included, "closed complete, mildly displaced left subchondral fracture, anterior mandibular symphyseal fracture opened complete and nondisplaced, multiple subluxated teeth, and multiple dental injuries." *Id*. Dr. Emison explained the surgery he recommended to repair the most urgent injuries. *Id*. at 20. Surgery was scheduled for October 14, 2017. Ex. 5 at 22.

On October 14, 2017, Ms. Hendricks underwent surgery – an open reduction with internal fixation ("ORIF") under general anesthesia to repair multiple fractures of her mandible. Ex. 5 at 19-25. Ms. Hendricks explained that it was an approximately three-hour surgery where "they placed crossbars in my chin to try to stabilize the break and then placed cross-wires all within my teeth to seal my jaw shut." Tr. at 13. She also stated that the sutures she received initially at Zuckerberg hospital "came apart during surgery, given how poorly the sutures were done, so they had to redo those as well…" Tr. at 13. When she came out of surgery, Ms. Hendricks explained that she experienced extreme pain to the side of her head and face. Tr. at 14. Her jaw was wired shut and she was unable to speak. *Id*. Ms. Hendricks stated that she experienced "extreme anxiety about throwing up" and choking due to the nausea caused by her pain medications. *Id*.

Two days later, on October 16, 2017, Ms. Hendricks returned to Dr. Emison for a post-operative consultation. Ex. 5 at 28. Petitioner reported that she was "okay" but was

3

still experiencing pain. *Id*. She reported that her mouth and lips were very sore, and her teeth were sensitive to temperature. *Id*. Dr. Emison noted that the maxillomandibular fixation with elastics was stable and Ms. Hendricks appeared to be in proper occlusion. *Id*. Petitioner's facial and oral wounds appeared within normal limits and were stable. *Id*.

One week later, on October 25, 2017, Ms. Hendricks returned for her second post-operative visit with Dr. Emison. Ex. 5 at 29. Petitioner expressed concern regarding her tooth mobility and twitching of the muscles in her face and noted that her mouth felt "dirty." *Id*. On exam, Ms. Hendricks had substantially less swelling, and her facial lacerations appeared within normal limits. *Id*. Her sutures were removed from her chin and her teeth were noted to be stable. *Id*. The elastics were replaced. *Id*. Ms. Hendricks was instructed to return in November. *Id*.

On November 2, 2017, Dr. Emison examined Ms. Hendricks at her two-and-a-half-week post-operative visit. Ex. 5 at 30. Petitioner reported that she was no longer taking opiate pain medication and was only occasionally taking Children's ibuprofen at night. *Id*. She reported that she was improving. *Id*. On examination, Ms. Hendricks was noted to be in good occlusion, her teeth were stable, there was no obvious discoloration of her teeth, and no infection. *Id*. Her elastics were removed and replaced. *Id*. Dr. Emison demonstrated how to remove and replace the elastic bands daily, as well as how to perform stretching exercises for her jaw and mouth. *Id*. By November 8, 2017, Ms. Hendricks was able to open her mouth to approximately two fingers vertical opening. *Id*. at 31.

Ms. Hendricks underwent a second surgical procedure on November 17, 2017, for removal of the maxillomandibular arch bars and for placement of orthodontic appliances. Ex. 5 at 36-37. Around this same time, temporary composites were placed on three of Ms. Hendricks's fractured teeth, while a fourth was extracted and subsequently replaced with a dental implant. Ex. 12 at 22, 25-26.

Over the next 18 months, Ms. Hendricks required multiple dental procedures, including four root canals, apical surgery, seven crowns, placement of a metal plate with six screws in her chin, and two teeth were extracted and replaced with dental implants. Ex. 10 at 1; Ex. 12 at 35-41, 88-92. She also needed a full set of braces after her jaw had healed to ensure that her teeth would stay within her gums. Tr. at 16. Ms. Hendricks attended 15 physical therapy sessions from December 2017 to December 2018 for her jaw. *See generally* Exs. 8, 11. She was discharged on December 12, 2018, to a home exercise program. Ex. 11 at 1-2. Ms. Hendricks received Invisalign braces to properly align her teeth and was completed with the process in October 2018. Ex. 12 at 91. As of May 2019, Petitioner's endodontist noted that one of Ms. Hendricks' teeth still had a guarded prognosis, while the others required continued monitoring. Ex. 18 at 1.

Overall, Ms. Hendrick's jaw was fully wired shut for five weeks, and then for two weeks, a small opening was allowed with rubber bands on the cross wires, and two weeks after that, another small opening was allowed. Tr. at 14-15. Ms. Hendricks stated that she was still not allowed to chew at that point, five to seven weeks after her initial injury. Tr. at 15. Ms. Hendricks explained that she had to eat through a syringe with a long red tube placed in the back of her mouth near her cheek, where liquid food was "push[ed] really slowly…" Tr. at 15. She explained that all she could eat was essentially "watered-down soup for multiple … weeks." *Id*. After the wires were removed, she still had to remain on soft foods for nearly six months. Tr. at 17.

In a letter regarding Ms. Hendricks's future prognosis, Belinda Gregory-Head DDS MS, stated that given Ms. Hendrick's youth, she could expect to need additional care for her damaged teeth over her expected lifetime. Ex. 19 at 1; ECF No. 39 (Declaration of Belinda Gregory-Head). Dr. Gregory-Head explained that Petitioner's upper teeth may grow further from the gum line over the next couple of decades, which could also cause recession of the gums. *Id*. This could result in the margin becoming exposed and would lead Petitioner to being vulnerable to tooth decay. *Id*. Dr. Gregory-Head stated that Ms. Hendricks may need to have some, or all of her crowns replaced once or twice in her lifetime. *Id*. In addition, because the nerve supply to Petitioner's teeth was damaged in the fall, the endodontically treated teeth would need additional care or possible surgery in the future. *Id*. Finally, Petitioner's teeth were repositioned orthodontically after the fall. *Id*. Retainers will be necessary for her lifetime so that her teeth may remain properly positioned. *Id*. at 2.

In her affidavits, live testimony, and as memorialized in medical records, Ms. Hendricks has described the mental toll the injury has had on her life. She started seeing a psychiatrist to deal with her trauma and emotional pain. *See generally*, Ex. 9; Ex. 23 at 1. She testified regarding the level of pain she had to endure during this time. While her jaw was wired shut, she had several teeth that had the roots exposed. Tr. at 18. She explained that every time something cold or hot touched her teeth, even hot or cold air, she experienced "excruciating pain on the teeth" which resulted in her needing a composite to seal her teeth to deal with the upcoming treatment she needed. *Id*.

Ms. Hendricks also testified as to the procedure she underwent to receive a prosthetic tooth implant, an extensive process took nearly a year to complete. Tr. at 20. Ms. Hendricks explained that when she fell, her teeth were knocked back into the position they originally were in before she had braces as a teenager. *Id*. She initially had to have orthodontic work completed, before receiving the implant for her damaged tooth. *Id*. For the implant process, Ms. Hendricks explained that it started with the removal of the tooth and then a bone graft placement, which required months of regrowth before the implant could be placed. *Id*. at 21. Once it was ensured that the bone was growing, Petitioner

5

underwent a surgical procedure to place a large screw/post in her mouth where the implant would be placed, and then allowed time for the area to heal. *Id*. Afterwards, a gum graft was placed to allow gum tissue to grow around the post and then a crown was placed. *Id*. Ms. Hendricks explained that the gum graft required a referral to another specialist, a dentist who specialized in treating gums, to create the gum grafts and place it all over her front teeth, given the extensive damage to her teeth overall. *Id.* Obtaining the gum grafts also required surgery because an area of the mouth had to be lacerated to obtain gum tissue to create the graft. *Id*. After the gum graft surgery, Ms. Hendricks stated that she was unable to eat any solid foods again. *Id*. In addition, she explained that it was very painful to talk or move her mouth because the gum grafts had to be surgically sewn into place. *Id*. at 22. Ms. Hendricks had multiple gum and bone graft procedures during the course of her treatment. *Id*. at 23-24.

Ms. Hendricks discussed the many appointments she attended during her treatment period, from surgeries, recoveries, appointments for recurring x-rays to monitor her progress, root canals, crown placements, post-operative appointments, physical therapy, etc. Tr. at 23-25. She explained that she had significant jaw pain and mobility issues which required that she attend physical therapy to assist in mobilizing her jaw to reduce the pain while she spoke, chewed, and moved her mouth. Tr. at 27. She also explained that because of her jaw injury, she also experienced pain into her neck and shoulders which caused extreme tension in those areas. Tr. at 27-28. She attended physical therapy to treat these areas. *Id*. at 28. Ms. Hendricks testified that she continues to have neck and shoulder pain to this day. *Id*.

Ms. Hendricks also explained how her injury affected her employment in the HR field where she is required to speak for long periods of time. Tr. at 36; Ex. 11 at 33. She stated that her procedures induced TMJ, which felt like a constant ache in her jaw. Tr. at 36. Because she is an HR professional, she stated that she had to use her jaw to speak for extended periods of time which constantly induced pain. *Id*.

Regarding her emotional state during this time, Ms. Hendricks testified that she experienced extreme anxiety as a result of the fall and the ongoing treatment that was required. Tr. at 29. She explained that there was not a single person in her treatment process keeping track of all her procedures or that would advocate for her, so she had to attempt to learn about all the procedures she was undergoing and to try to coordinate and communicate, as best she could, about her treatment. *Id*. at 29-30. For example, Ms. Hendricks testified that she had to undergo an MRI for an unrelated medical condition, and she had no information about the type of plate that was in her chin. Tr. at 32. She had to be removed from the MRI machine until it was determined what material the plate in her chin was made of. *Id*.

Ms. Hendricks stated that she experienced frightening nightmares in the first three to four months after the fall. *Id*. More recently, her dreams involved anxiety about all the procedures she has had to undergo and may need to undergo in the future. *Id*. at 30. She states that she currently needs to see the dentist four times a year to monitor her teeth and gums and to ensure that decay is not occurring. *Id*.

### III.   Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include an award "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment awarding such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no precise formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in each case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, a special master may rely on his or her own experience adjudicating similar claims. *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated that special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual

7

claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Human Servs.*, 109 Fed. Cl. 579 (2013).

### IV.   Appropriate Compensation for Petitioner's Pain and Suffering

#### A.   Pain and Suffering

In this case, awareness of the injury is not contested. The record reflects that at all times, Petitioner was a competent adult with no impairments that would impact her awareness of her injury. Therefore, I analyze principally the severity and duration of Petitioner's injury. Petitioner requested the full amount permitted by the Vaccine Act, $250,000.00, for her actual/past pain and suffering. Mot. at 2. In reaction, Respondent stated that the evidence supported a lesser award of $140,000.00. Opp. at 3.

In performing my analysis, I have reviewed the record as a whole, including all medical records, affidavits, declarations, and all other filed evidence, plus the parties' briefs, other pleadings, and the hearing testimony. My ultimate determination is based on the specific circumstances of this case. In addition, in any case in which the parties cannot agree to a damages component, I have considered my experience adjudicating damages generally – including the fact that even the most self-limiting and transient of vaccine injuries from an immediate-impact stance can have "significant treatment consequences." *Hietpas v. Sec'y of Health & Hum. Servs.*, No. 19-1702V, 2021 WL 688620, at *5 (Fed. Cl. Spec. Mstr. Jan. 15, 2021) (recognizing that intussusception can necessitate surgical intervention).

Because most vaccine injuries involving syncope, presyncope, and vasovagal responses are resolved informally, there are few reasoned decisions to guide the outcome in this case. While Petitioner describes her injury and the substantial treatment that she has had to endure, she does not cite to any specific case to support her proposed figure of $250,000.00. Respondent cites to two cases: (1) *Neff v. Sec'y of Health & Human Servs.*, No. 08-906V, 2010 WL 2710646 (Fed. Cl. Spec. Mstr. June 15, 2010), and (2) *Hietpas v. Sec'y of Health & Human Servs.*, No. 19-1702V, 2021 WL 688620 (Fed. Cl. Spec. Mstr. Jan. 5, 2021).

The *Neff* case is a 2010 case that involved a petitioner who suffered vasovagal syncope that was caused by her receipt of an HPV vaccination. *Neff v. Sec'y of Health & Hum. Servs.*, No. 08-0906V, 2010 WL 2710646, at *1 (Fed. Cl. June 15, 2010). That claimant fell and struck her head which caused brain bleeding, a concussion, and loss of

sense of smell. *Id*. She experienced these injuries for more than six months. The case was resolved by a proffer, and the petitioner was awarded a total of $110,000.00. *Id*.

In *Hietpas*, 2021 WL 688629, a petitioner was awarded $140,000.00 for the pain and suffering she experienced as a result of a post-vaccination syncopal injury. That petitioner sustained a chin laceration (causing permanent scaring), a jaw fracture, and underwent ORIF surgery two days later. Although she was noted to be healing well in the aftermath of her surgery, the *Hietpas* petitioner reported jaw pain, ear pressure, and intermittent difficulty chewing in the following months. Approximately seven months after surgery, her complaints included a clicking and popping sensation when opening her mouth. And despite attending seven sessions of physical therapy, she was eventually assessed with right and left TMJ displacement with reduction. Approximately one year after her injury, she was fitted with an orthopedic cast that had to be worn for 18 hours a day for a year. Based on this timeline, Petitioner's course of treatment lasted approximately two years after her syncopal episode.

While the *Hietpas* case certainly provides some aid in assessing the proper measure of damages in this case, there have been two additional syncope cases that provide additional insight – *Campbell v. Sec'y of Health & Human Servs*., No. 20-038V, 2022 WL 1074979, at *1 (Fed. Cl. Jan. 4, 2023) and *Marcillo v. Sec'y of Health & Human Services*, No. 20-2061V, 2021 WL 4704789, at *1 (Fed. Cl. April 14, 2023).

In *Campbell,* a petitioner was awarded $190,000.00 in pain and suffering after becoming dizzy shortly after receiving a flu vaccination and falling down a number of stairs causing fractures and other injuries to her left tibia and fibula. *Campbell,* 2022 WL 1074979, at *2. However, due to the petitioner's poor bone quality, the injuries required three surgeries to repair. *Id*. at *3. Each surgery resulted in a brief hospitalization, prescription pain medication, and limited range of motion and weightbearing. *Id*. at *5. The *Campbell* petitioner's injuries also caused a significant disruption to her life – including medically extended absences totaling approximately one year (the petitioner was a histology specialist at Massachusetts General Hospital). Although the petitioner's initial injury was "transient and seemingly minor," the impact of the event was found to be uncommonly severe – justifying a fairly high pain and suffering award. *Id*.

A case that is particular useful to this case is *Marcillo*, 2021 WL 4704789, where a petitioner suffered a syncopal episode after being administered a Tdap vaccine. *Id*. at *2. The petitioner had lost consciousness and hit his head against a metal table before falling on to the ground. *Id*. Ultimately, the *Marcillo* petitioner underwent four surgical procedures in a seven-month period – all of which were complex. *Id*. In addition to surgery, the petitioner's jaw was wired shut for approximately one month. *Id*. During this time, the petitioner was required to abide by a liquid diet and was forced to "vacuum" his

9

mouth to suction out pooling blood and saliva. *Id*. Braces were placed on petitioner's approximately six months later. *Id*. Once the petitioner's orthodontic treatment was completed, he was required to undergo the extraction of his wisdom teeth and removal of the hardware near his right condyle. *Id*. The petitioner would then undergo a total joint replacement once a mold of his jaw was taken. It was found that based on this timeline, the petitioner's course of treatment was likely to extend over a total of at least four years. *Id*. Considering the severity and duration of the petitioner's syncopal injury along with the personal hardships he experienced as a result, he was awarded the maximum $250,000.00 in actual pain and suffering. *Id*.

In making my determination on an appropriate award, I have also fully considered Petitioner's sworn affidavits and her testimony, in which she described, in detail, the excruciating pain she experienced throughout her injury as well as the circumstances that magnified the suffering and emotional distress she experienced as a result of her syncopal injury. In all, Ms. Hendricks had to endure at least three separate surgeries, some of which took multiple hours to perform. In explaining one procedure, Ms. Hendricks recounted that bone and gum grafts had to be removed from her mouth, grown separately (which could take several months) and then placed in her mouth. Tr. at 21. She explained that at some points during her treatment, the nerves and roots of her teeth were exposed, causing "excruciating pain" on her teeth. Tr. at 18. Petitioner also underwent four root canals, seven crowns, the placement of a metal plate with six screws in her chin, two tooth extractions, which were eventually replaced with dental implants. Tr. at 16. Ms. Hendricks had her mouth fully wired shut for five weeks, and partially wired shut for at least another two weeks. Tr. at 15. During this time, she was required to eat her food through a syringe. *Id*. After the wires were removed from her mouth, she was still required to eat soft foods for at least six months. Tr. at 17. Ms. Hendricks attended at least 15 physical therapy appointments to assist in mobilizing her jaw to reduce pain while she spoke, chewed, and moved her mouth. Tr. at 27-28. Because of her jaw injury, she also attended physical therapy to address the neck and shoulder pain she experienced as her jaw caused tension into these areas. *Id*.

Ms. Hendricks credibly recounted her feelings of fear and anxiety as a result of all her procedures and ongoing treatment. Tr. at 29. She explained how she had to keep track of all her procedures in order to coordinate and communicate between the different specialists, because there was no single point of contact for all her physicians and medical providers. Tr. at 29-30. Ms. Hendricks described the frightening nightmares she experienced in the first few months after her fall and her anxiety about her future prognosis and procedures. Tr. at 32. And the record demonstrates that Ms. Hendricks will need ongoing dental care, including monitoring of her dental implants, bone and gum regrowth, as well as braces and retainers.

Given all of the foregoing, this case reflects circumstances in which a full award of pain and suffering at the top of the "cap" for that damages component is fair and reasonable. While the injury at issue was not life-threatening, and may not be on all fours with the kind of devastating neurologic harm that some vaccine injuries can be shown to produce, the degree of intrusive medical care required to ameliorate the Petitioner's health was notably high – along with the personal impacts of that treatment.

Accordingly, after considering the severity and duration of Petitioner's syncopal injury along with the personal hardships she has experienced as a result, and considering the arguments presented by both parties at the hearing, a review of the relevant caselaw and the written record, I find that $250,000.00 in total compensation for actual pain and suffering is reasonable in this case.

### a. Award for Past Unreimbursable Expenses

Petitioner also requests $81,510.43 in past unreimbursable expenses. Mot. at 2. Respondent argues that the medical records only document $36,102.82, in past medical expenses. Opp. at 6. After carefully reviewing the documentation submitted by Petitioner and verifying the payments that were actually incurred, I award Ms. Hendricks $78,661.74 in past unreimburseable expenses.[4] See Appendix A.

### b. Award for Future Medical Care

In her brief, Petitioner requests $39,000.00 for her future medical care. Mot. at 2. Respondent argues that $7,000.00, is reasonable and appropriate for Petitioner's future medical care, noting that Petitioner did not make any offset for insurance in her calculation. Opp. at 10.

Total recoverable compensation for an established vaccine injury is offset by amounts paid or expected to be paid under an insurance policy and certain State or Federal programs. Section 15(g); Hulon v. Sec'y of Health & Hum. Servs., No. 19-1985V, 2022 WL 2069141, at *1 (Fed. Cl. May 3, 2022). Thus, the Vaccine Act always and by its own terms functions as a *secondary payer* to a petitioner's health care insurance – the "payor of last resort." Indeed, the Act *prohibits* any "policy of health insurance" from "mak[ing] payment of benefits under the policy *secondary* to the payment of compensation under the Program," and also prohibits an entity that "provides health services on a prepaid basis or provides health benefits" from "mak[ing] the provision of health services or health benefits secondary to the payment of compensation under the Program." Section 15(h) (emphasis added). Respondent's proposed award of $7,000.00

---

[4] Appendix A contains an excel spreadsheet identifying the expense/invoice and location of the correspondent payments by Petitioner.

is reasonable and appropriate under the circumstances.[5] Therefore, Petitioner is awarded this amount without adjustment.

## Conclusion

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $<u>335,661.74</u>, (representing $250,000.00 for Petitioner's actual pain and suffering, $78,661.74, for past unreimbursable expenses, and $7,000.00 future medical care) to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** These amounts represent compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[6]

**IT IS SO ORDERED.**

**<u>s/Brian H. Corcoran</u>**
Brian H. Corcoran
Chief Special Master

---

[5] This sum was discounted to net present value and takes into consideration the treatment Petitioner is likely to need, based on the letter from Petitioner's prosthodontist, Belinda Gregory-Head, D.D.S., M.S. (Ex. 19), with an offset for insurance coverage (e.g., Ex. 53 at 10-11, Petitioner's Cigna dental policy: 50% paid for major restorative work after $1,500 deductible).

[6] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.

| Medical Charges/Requested Reimbursement on Ex. 2 at pg. 546 | Corresponding charge date | Missing the corresponding invoice | Confirmed Invoices Located | Check No/CC | ECF No. | ECF Page No. | Duplicate Page No. |
|---|---|---|---|---|---|---|---|
| CVS Los Gatos | 11/20/2017 | $ 23.28 | | | 43-2 | | |
| CVS Los Gatos | 11/20/2017 | $ 15.89 | | | 43-2 | | |
| CVS Poway | 11/20/2017 | $ 32.21 | | | 43-2 | | |
| CVS Los Gatos | 11/20/2017 | $ 59.86 | | | 43-2 | | |
| CVS Poway | 11/20/2017 | $ 22.07 | | | 43-2 | | |
| Walgreens San Francisco | 11/1/2017 | $ 82.13 | | | 43-2 | | |
| Dr. John Emison DDS | 10/12/2017 | | $ 7,625.00 | Check | 43-2 | 120 | 121 |
| " | 11/17/2017 | | $ 700.00 | Credit Card | 43-2 | 121 | 723 |
| " | 3/6/2018 | | $ 3,180.00 | unknown | 43-2 | 79 | |
| CEP America | 11/11/2017 | | $ 387.00 | Credit Card | 43-2 | 577 | |
| " | 11/17/2017 | | $ 1,210.00 | Credit Card | 43-2 | 122 | |
| King Ambulance | 10/11/2017 | | $ 411.42 | Check No. 5748 | 43-2 | 77 | |
| Dr. Dennis McCalley, DDS | 12/7/2017 | | $ 240.00 | Check | 43-2 | 140 | |
| Dr. Rodney Lee, Orthodontist | 12/13/2017 | | $ 2,280.00 | Check No. 5752 | 43-2 | 156 | |
| " | 3/7/2018 | | $ 4,066.00 | Check No. 5785 | 43-2 | 156 | |
| Dr. Rebecca Boardman | 12/9/2017 | | $ 230.00 | Check | 43-2 | 424 | |
| " | 1/7/2018 | | $ 81.00 | Check | 43-2 | 424 | |
| " | 2/5/2018 | | $ 152.60 | Check | 43-2 | 424 | 784 |
| Dr. Colleen Hoblit | 12/14/2017 | | $ 180.00 | Check No. 5756 | 43-2 | 143 | |
| Bernardo Dermatology | 4/19/2019 | | $ 24.46 | Check No. 5884 | 43-2 | 573 | |
| SFGH Medical Group | 10/26/2017 | | $ 187.50 | Credit Card | 43-2 | 789 | |
| Harriet Wolfe, MD | 1/2/2018 | | $ 1,650.00 | Check No. 5763 | 43-2 | 624 | |
| " | 1/2/2018 | | $ 300.00 | Check No. 5764 | 43-2 | 622 | |
| " | 2/22/2018 | | $ 825.00 | Check No. 5783 | 43-2 | 627 | |
| " | 2/28/2018 | | $ 550.00 | Check No. 5789 | 43-2 | 629 | |
| " | 11/13/2018 | | $ 800.00 | Check No. 5852 | 43-2 | 618 | 619 |
| " | 3/28/2018 | | $ 1,100.00 | Checks 5794 & 5807 | 43-2 | 631 | |
| " | 4/26/2018 | | $ 550.00 | Check No. 5808 | 43-2 | 886 | |
| " | 5/13/2019 | | $ 800.00 | Check No. 5872 | 43-2 | 620 | |
| " | 7/9/2019 | | $ 600.00 | Check No. 5883 | 43-2 | 621 | |
| Dr. Pasquinelli | | | $ 2,820.00 | Credit Card | 43-2 | 156 | 415 |

1

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| " | | | $ 3,196.00 | Check | 43-2 | 414 | |
| " | | | $ 586.00 | Credit Card | 43-2 | 418 | |
| " | | | $ 1,832.00 | Credit Card | 43-2 | 415 | |
| " | | $ 282.00 | | | | | |
| San Francisco General Hospital | | | $ 3,964.36 | Check No. 5762 | 43-2 | 820 | |
| "Molly reim for Dr bills" | | | $ 700.00 | unknown | 43-2 | 120 | |
| Jane Quach, PT | 1/17/2018 | | $ 175.00 | Credit Card | 43-2 | 696 | |
| " | 1/24/2018 | | $ 175.00 | Credit Card | 43-2 | 697 | |
| " | 2/15/2018 | | $ 175.00 | Check | 43-3 | 698 | |
| " | 2/9/2018 | | $ 175.00 | Credit Card | 43-2 | 699 | 710 |
| " | 2/23/2018 | | $ 175.00 | Check | 43-2 | 700 | |
| " | 8/13/2018 | | $ 175.00 | Check | 43-2 | 701 | |
| " | 7/24/2018 | | $ 175.00 | Check | 43-2 | 702 | |
| " | 7/11/2018 | | $ 175.00 | Check | 43-2 | 703 | |
| " | 12/7/2017 | | $ 175.00 | Credit Card | 43-2 | 705 | |
| " | 1/31/2018 | | $ 175.00 | Credit Card | 43-2 | 707 | |
| Gentle Dental X-Ray | 3/20/2018 | | $ 360.00 | Check | 43-2 | 763 | |
| Mission Bay Medical Group | 3/14/2018 | | $ 385.00 | Check No. 5790 | 43-2 | 747 | |
| " | 5/19/2018 | | $ 100.65 | Check No. 5806 | 43-2 | 747 | |
| " | 5/19/2018 | | $ 94.90 | Check No. 5805 | 43-2 | 747 | |
| " | 8/13/2018 | | $ 328.00 | Check No. 5822 | 43-2 | 747 | |
| " | 11/8/2018 | | $ 576.50 | Check No. 5841 | 43-2 | 748 | |
| " | 5/19/2019 | | $ 382.90 | Check No. 5871 | 43-2 | 748 | |
| " | 11/6/2019 | | $ 399.25 | Check No. 5902 | 43-2 | 748 | |
| " | 11/19/2019 | | $ 64.30 | Check No. 5907 | 43-2 | 749 | |
| " | 12/17/2019 | | $ 29.00 | Check No. 5911 | 43-2 | 749 | |
| " | 4/1/2020 | | $ 355.85 | Check No. 5920 | 43-2 | 749 | |
| " | 8/6/2020 | | $ 102.40 | unknown | 43-2 | 749 | |
| Dr. Belinda Gregoryhead | 4/5/2018 | | $ 105.00 | Check | 43-2 | 443 | |
| " | 7/30/2018 | | $ 261.00 | Check | 43-2 | 443 | |
| " | 8/13/2018 | | $ 1,500.00 | Credit Card | 43-2 | 443 | 557 |
| " | 9/18/2018 | | $ 350.00 | Credit Card | 43-2 | 443 | |
| " | 12/11/2018 | | $ 261.00 | Check | 43-2 | 443 | |
| " | 4/30/2019 | | $ 16,600.00 | Credit Card | 43-2 | 558 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| " | 10/16/2019 | | $ | 174.00 | Check | 43-2 | 560 | |
| DeSchamps Braly plastic surgery | 1/24/2018 | | $ | 300.00 | unknown | 43-2 | 586 | |
| " | 3/26/2018 | | $ | 271.25 | unknown | 43-2 | 586 | |
| Atlas Massage | 8/12/2018 | | $ | 375.00 | Credit Card | 43-2 | 545 | |
| " | 10/29/2018 | | $ | 375.00 | Credit Card | 43-2 | 545 | |
| " | | $ | 85.00 | | | 43-2 | | |
| " | | $ | 255.00 | | | 43-2 | | |
| " | | $ | 425.00 | | | 43-2 | | |
| Bay Area Anesthesia Group | 12/11/2018 | | $ | 1,500.00 | Credit Card | 43-2 | 551 | |
| LabCorp | 10/13/2018 | | $ | 20.87 | Check No. 5840 | 43-2 | 741 | |
| " | | $ | 5.48 | | | 43-2 | | |
| UCSF Med Group | 9/26/2018 | | $ | 39.20 | Credit Card | 43-2 | 810 | |
| " | 11/25/2018 | | $ | 115.00 | Credit Card | 43-2 | 806 | |
| " | | $ | 647.28 | | Credit Card | 43-2 | | |
| " | | $ | 140.37 | | Credit Card | 43-2 | | |
| " | 10/26/2017 | | $ | 187.50 | Credit Card | 43-2 | 789 | |
| Endodontic Arts | 3/29/2018 | | $ | 1,825.00 | Credit Card | 43-2 | 256 | |
| " | 4/3/2018 | | $ | 3,323.00 | Credit Card | 43-2 | 256 | |
| " | 12/11/2018 | | $ | 2,529.40 | Credit Card | 43-2 | 256 | |
| Simon Medical | 7/12/2019 | | $ | 191.16 | Credit Card | 43-2 | 794 | |
| Sutter Health | 8/28/2019 | | $ | 116.27 | unknown | 43-2 | 800 | |
| Mollie Tobias Therapy | 10/24/2019 | | $ | 1,950.00 | Credit Card | 43-2 | 752 | |
| Genova Diagnotstic | 6/22/2018 | | $ | 135.00 | Credit Card | 43-2 | 616 | |
| Today Urgent Care | | $ | 46.73 | | | 43-2 | | |
| Postive Edge | | $ | 50.00 | | | 43-2 | | |
| | | | | | | | | |
| **Total** | | | $ | **78,661.74** | | | | |

3